2024-1556

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

---

**MID CONTINENT STEEL & WIRE, INC.,**
*Plaintiff-Appellee*

**v.**

**UNITED STATES,**
*Defendant-Appellee,*

**PT ENTERPRISE INC., PRO-TEAM COIL NAIL
ENTERPRISE INC., UNICATCH INDUSTRIAL CO., LTD.,
WTA INTERNTIONAL CO., LTD., ZON MON CO., LTD.,
HOR LIANG INDUSTRIAL CORPORATION, PRESIDENT
INDUSTRIAL INC., LIANG CHYUAN INDUSTRIAL CO., LTD.,**
*Defendants-Appellants*

---

Appeal from the United States Court of International Trade in Case
Nos. 15-cv-00213 and 15-cv-00220, Judge Claire R. Kelly

---

## RESPONSE BRIEF OF PLAINTIFF-APPELLEE
## MID CONTINENT STEEL & WIRE, INC.

Adam H. Gordon
THE BRISTOL GROUP PLLC

Dated: August 15, 2024

*Counsel to Plaintiff-Appellee Mid
Continent Steel & Wire, Inc.*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 24-1556 |
| **Short Case Caption** | Mid Continent Steel & Wire, Inc. v. US |
| **Filing Party/Entity** | Mid Continent Steel & Wire, Inc. |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.


Date: 08/15/2024

Signature: /s/ Adam H. Gordon

Name: Adam H. Gordon

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☐ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Mid Continent Steel & Wire, Inc. | | Wholly owned by DEACERO USA Inc., a subsidiary of DEACERO S.A.P.I. de C.V. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐  Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐    None/Not Applicable        ☐    Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐   Yes (file separate notice; see below)    ☑   No    ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable        ☐    Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

## CONFIDENTIAL MATERIAL DELETED FROM THE NONCONFIDENTIAL BRIEF

Business proprietary information contained in brackets on pages 13-15 of this brief is redacted from the nonconfidential brief. This business proprietary information is subject to the protective order in the administrative proceeding before the U.S. Department of Commerce, the U.S. Court of International Trade and Federal Circuit Rule 28(d), and values calculated therefrom. The material redacted from these pages includes information that the Commerce Department has allowed Defendants-Appellants to treat as business proprietary, specifically concerning the number, quantity and value of sales.

**Page**

TABLE OF CONTENTS............................................................................i

TABLE OF AUTHORITIES...................................................................iii

STATEMENT OF RELATED CASES ....................................................1

ISSUE PRESENTED ................................................................................2

STATEMENT OF THE CASE ..................................................................2

I.      NATURE OF THE CASE................................................................2

SUMMARY OF ARGUMENT ..................................................................3

ARGUMENT ..............................................................................................8

I.      STANDARD OF REVIEW .............................................................8

II.     COMMERCE HAS PROVIDED A REASONABLE, REASONED, AND WELL SUPPORTED JUSTIFICATION FOR DEPARTING FROM THE ACKNOWLEDGED LITERATURE ON COHEN'S *d* MEASURE........................................................................................9

III.   WEIGHTED AVERAGING IS NOT APPROPRIATE FOR THE MANNER IN WHICH COMMERCE APPLIES THE COHEN'S *D* MEASURE ................................................................. 18

IV.   USING THE STANDARD DEVIATION OF THE ENTIRE POPULATION IN THE DENOMINATOR IS NOT APPROPRIATE ........................................................... 19

V.   THE TRADE COURT'S DECISION SHOULD BE AFFIRMED .. 27

VI.   THE ARGUMENTS OF THE TAIWANESE RESPONDENTS AND *AMICI* ARE WITHOUT MERIT ........................................... 29

VII.   CONCLUSION ................................................................. 38

# TABLE OF AUTHORITIES

## CASES

*Ad Hoc Shrimp Trade Action Comm. v. United States,*
  802 F.3d 1339, 1348 (Fed. Cir. 2015) .................................................8, 9

*Chemtall, Inc. v. United States,*
  878 F.3d 1012, 1018 (Fed. Cir. 2017) ...................................................8

*Consol. Edison Co. v. NLRB,*
  305 U.S. 197, 229 (1938) ...................................................................8

*Consolo v. Fed. Mar. Comm'n,*
  383 U.S. 607, 619–20 (1966).............................................................9

*Dupont Teijin Films USA, LP v. United States,*
  407 F.3d 1211, 1215 (Fed. Cir. 2005) ...................................................8

*Mid Continent Steel & Wire, Inc. v. United States,*
  31 F.4th 1367 (Fed. Cir. 2022) .................................................... passim

*Mid Continent Steel & Wire, Inc. v. United States,*
  495 F. Supp. 3d 1298 (Ct. Int'l Trade 2021) .........................................2

*Mid Continent Steel & Wire, Inc. v. United States,*
  680 F.Supp.3d 1346 1353 (Ct. Int'l Trade 2024). .........................28, 29

*Mid Continent Steel & Wire, Inc. v. United States,*
  940 F.3d 662 (Fed. Cir. 2019).............................................................1

*Yangzhou Bestpak Gifts & Crafts Co. v. United States,*
  716 F.3d 1370, 1377 (Fed. Cir. 2013) ...................................................8

## STATUTES

19 U.S.C. § 1516a(b)(1)(B)(i) ....................................................................8

19 U.S.C. § 1673b ..................................................................................35

19 U.S.C. § 1673b(d)(1)(A)(i) ................................................. 35

19 U.S.C. § 1673d(c)(1)(B)(i)(I) .............................................. 35

19 U.S.C. § 1677f-1(d)(1)(B)(i) ........................................... 7, 22

19 U.S.C. § 1677f-1(d)(1)(B)(i)-(ii) ............................... 2, 3, 4, 5

---

**RESPONSE BRIEF OF PLAINTIFF -APPELLEE
MID CONTINENT STEEL & WIRE, INC.**

---

## STATEMENT OF RELATED CASES

Pursuant to Rule 47.5 of the Rules of the United States Court of Appeals for the Federal Circuit, counsel for Defendant-Appellee Mid Continent Steel & Wire, Inc. ("Mid Continent") is aware of the following appeals in or from this action that previously were before this Court or any other appellate court under the same or similar title.

1. The Title and Number of that Earlier Appeal: *Mid Continent Steel & Wire Inc. v. US*, 2018-1229, 2018-1251

    a. Date of Decision: October 3, 2019

    b. Composition of Panel: Judges Newman, O'Malley, and Taranto

    c. The Citation of the Opinion: *Mid Continent Steel & Wire, Inc. v. United States*, 940 F.3d 662 (Fed. Cir. 2019)

2. The Title and Number of that Earlier Appeal: *Mid Continent Steel & Wire Inc. v. US*, 2021-1747.

    a. Date of Decision: April 21, 2022

    b. Composition of Panel: Judges Newman, Lourie, and Taranto

    c. The Citation of the Opinion: *Mid Continent Steel & Wire, Inc. v. United States*, 31 F.4th 1367 (Fed. Cir. 2022)

There are no directly related appeals before the U.S. Court of International Trade.

## ISSUE PRESENTED

Whether the U.S. Department of Commerce's ("Commerce") has provided a "reasonable justification for departing from what the acknowledged literature teaches" concerning how the denominator is calculated for the effect size (the "Cohen's d coefficient"), a part of the Cohen's *d* analysis used when seeking to determine whether a pattern of export prices exists pursuant to 19 U.S.C. § 1677f-1(d)(1)(B)(i)-(ii). In other words, whether Commerce has complied with the Court's directive in the last appeal concerning this issue, when the court remanded the case for further consideration by Commerce on this issue. *Mid Continent Steel & Wire, Inc. v. United States*, 31 F.4th 1367 (Fed. Cir. 2022) ("*Mid Continent V*"), *rev'g in part* 495 F. Supp. 3d 1298 (Ct. Int'l Trade 2021) ("*Mid Continent IV*").

## STATEMENT OF THE CASE

## I.    NATURE OF THE CASE

This appeal arises from an antidumping investigation involving imports of steel nails from Taiwan. An antidumping ("AD") order was imposed in 2015. This appeal challenges one discrete aspect of the way

2

Commerce determines whether a pattern of export prices exists pursuant to 19 U.S.C. § 1677f-1(d)(1)(B)(i)-(ii).  To carry out its authority under that statutory provision, Commerce developed a complex analytical tool based on certain statistical tests.

Defendants-Appellants PT Enterprise Inc. *et al.* ("Taiwanese Respondents") challenge one aspect of the methodology, *i.e.*, the way Commerce calculates a value in the denominator of the calculations it conducts.  This Court has remanded the case for further explanation several times.  The Trade Court affirmed Commerce's most recent explanation, finding that it provided a reasonable basis for the approach Commerce has taken.

## SUMMARY OF ARGUMENT

This appeal involves a challenge to Commerce's choice to analyze whether a pattern of prices exists by using a simple average rather than a weighted average in one step of a highly complex methodology.  The Taiwanese Respondents prefers use of a weighted average because doing so would eliminate the dumping margin and require revocation of the antidumping order.

Commerce's remand determination provides a reasonable justification of the approach it has taken and its determination to depart from what the acknowledged literature teaches concerning calculation of the Cohen's $d$ coefficient.

Specifically, Commerce identified and relied on uncontested principles underlying the various approaches taught in the acknowledged literature concerning reliability of samples and full populations of data, and applied them within the specific context of the analysis required to effectuate the authority Congress provided to it in 19 U.S.C. § 1677f-1(d)(1)(B)(i)-(ii).

While it has taken considerable time (indeed, years) and multiple remands to get to this point, Commerce has articulated a clear and reasonable rationale and justification for its methodology. While the Taiwanese Respondents naturally prefer a different approach that would result in revocation of the antidumping order, Commerce's approach is reasonable. The Trade Court's decision, and Commerce's remand determination, should be affirmed.

Conversely, the Taiwan Respondents' proposed methodology has no support in the acknowledged literature. In fact, it violates

fundamental statistical principles and would produce inconsistent results depending on the units of measure for the sales quantities. Therefore, the Taiwanese Respondents' proposed methodology is not a reasonable interpretation of the statute.

It is reasonable for Commerce to use a simple average instead of a weighted average to calculate the pooled standard deviation as part of the Cohen's $d$ test, because Commerce's goal is to measure an abstract effect, *i.e.*, pricing behavior in the test group vis-à-vis pricing behavior in the comparison group.

This is directly rooted in the statutory language, which refers to "a pattern of export prices (or constructed export prices)" without more. 19 U.S.C. § 1677f-1(d)(1)(B)(i)-(ii) specifically provides:

> The administering authority may determine whether the subject merchandise is being sold in the United States at less than fair value by comparing the weighted average of the normal values to the export prices (or constructed export prices) of individual transactions for comparable merchandise, if —
>
> (i) there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time ….

The statute does not contemplate, much less direct, Commerce to factor in the size (kilograms) of the sales associated with the prices it

examines. Indeed, were Commerce to do so, it would arguably be acting contrary to the statute.

To be clear, the statute directs Commerce to identify differences in prices *per se*, in the abstract and without regard to other aspects of the transactions, including the size of the sale (*i.e.*, how many kilograms cartons, etc. were sold at the price being examined) and motivations underlying the pricing decisions a respondent makes (*i.e.*, why the seller decided to charge a particular price to a customer, in a region, or at a certain point in time). *Why* a pattern of prices exists is irrelevant, as is the size of the sale associated with the price being examined; it is the presence of a pattern of prices, on its own, that the statute directs Commerce to assess.

Using a simple average avoids distorting the analysis, which would result if Commerce were to weight prices in its analysis by the quantity of the associated sale. A simple average ensures that equal weight is given to the pricing behavior of both groups being compared, and avoids skewing the outcome by weighting one group more than the other group.

The Taiwanese Respondents' proposed method of weighting the standard deviations of the test group and the comparison group by their respective sales quantities to calculate the pooled standard deviation has no support in the acknowledged literature. When the acknowledged sources use a weighted average, all literature sources on the record weight it by the sample size, *i.e.*, the number of observations in the sample (or the number of transactions in the case here). The Taiwanese Respondents' proposed formula of weighting by sales quantities (for example, the weight in kilograms) runs afoul of fundamental statistical principles, including those detailed in Cohen's text, and would produce inconsistent results depending on the units of measure for the sales quantities.

Faced with a choice between The Taiwanese Respondents' modified Cohen's *d* formula that has no support in any of the sources, and a simple average that has been recognized as a valid variation of the effect size calculation and used here for the purpose of identifying significant price differences between two equally important and reliable groups, Commerce reasonably determined that the latter is a reasonable interpretation of 19 U.S.C. § 1677f-1(d)(1)(B)(i).

**ARGUMENT**

## I. STANDARD OF REVIEW

The Court applies the same standard of review that was applied by the Trade Court when reviewing a final antidumping determination by Commerce. *See Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1377 (Fed. Cir. 2013); *Dupont Teijin Films USA, LP v. United States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (internal citation omitted). In this context, the Court "give{s} great weight to the informed opinion of that court, which has expertise in international trade matters." *Chemtall, Inc. v. United States*, 878 F.3d 1012, 1018 (Fed. Cir. 2017) (internal quotation marks and citation omitted).

Commerce's determination will be sustained unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). A finding is supported by substantial evidence if a reasonable mind might accept the evidence to support the finding. *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). "An agency finding may still be supported by substantial evidence even if two inconsistent conclusions can be drawn from the evidence." *Ad Hoc Shrimp Trade Action Comm. v. United*

8

*States*, 802 F.3d 1339, 1348 (Fed. Cir. 2015) (*quoting Consolo v. Fed.*

*Mar. Comm'n*, 383 U.S. 607, 619–20 (1966)).

## II. COMMERCE HAS PROVIDED A REASONABLE, REASONED, AND WELL SUPPORTED JUSTIFICATION FOR DEPARTING FROM THE ACKNOWLEDGED LITERATURE ON COHEN'S *d* MEASURE

In its *Final Remand Results* (Appx2401-2467)*,* Commerce

provided additional reasoning to address this court's concerns about the

use of a simple average in the calculation of the denominator of the

Cohen's *d* coefficient as part of the differential pricing analysis.

Commerce sufficiently addressed the points raised by this Court opinion

in *Mid Continent Steel & Wire, Inc. v United States*, 31 F.4th 1367 (Fed.

Cir. 2022) ("*Mid Continent V*").

The following language from the *Final Remand Results* is key in

framing the issue before the court:

> Neither Dr. Cohen, nor Dr. Ellis, nor Professor Coe
> opined on the application of the concept of effect size to
> examine whether prices differ significantly among
> purchasers, regions or time periods under the
> antidumping statute. Nor could one reasonably expect
> an academic author to be omniscient and describe all
> possible applications of his or her concepts, including
> the situation addressed by Commerce in the use of its
> Cohen's *d* test. Similarly, these academic authors do
> not know the myriad situations in which their concepts
> may be applied. Such expectations are unrealistic that

any applications must be preordained by an academic author rather than their concepts being adapted and applied in situations unimagined by the original authors. Nonetheless, these academicians did describe the general principles behind both the concept of effect size and its place in research and data analysis which Commerce has applied in its differential pricing analysis. Commerce has followed these principles in conceptualizing and applying the Cohen's $d$ test.

*Final Remand Results* at 57 (Appx2457). Commerce correctly implemented the Cohen's $d$ measure given the circumstances it faces in its antidumping cases. Commerce's purpose in using the Cohen's $d$ measure is to calculate a standardized expression of mean differences to measure the effect by which two populations' average prices differ. This also is the main purpose for the development of Cohen's $d$ as described by Cohen himself: measuring the effect to which two populations' average values differ. For Commerce's purposes, the two groups to be compared are determined for each discrete category of products subject to the antidumping proceeding (each "control number", or CONNUM) by selecting the sales to an individual purchaser that are then compared to the sales to all other purchasers, the sales in a specific region compared to those in all other regions, or the sales in a specific time period compared to the sales in all other time periods. The

analysis is repeated for all purchasers, regions, and time periods to produce different versions of the $d$ measure that are used to evaluate whether patterns of "significantly"[1] differing prices exist in a complete population of U.S. sales made by the foreign producer or exporter. All sales of each CONNUM are used in each of these analyses.[2] Therefore, this is a population-to-population comparison, and no statistical sampling, or estimation, is performed or needed.

Commerce's methodology reflects this reality:

> In Commerce's application of the Cohen's $d$ test, Commerce uses the full populations of data, *i.e.*, all prices of comparable merchandise to a given purchaser, region, or time period (*i.e.*, the test group) and all prices of comparable merchandise to all other purchasers, regions, or time periods (*i.e.*, the comparison group). As a result, the standard deviations calculated for the test and comparison groups each have a reliability of 100 percent, *i.e.*, "the closeness with which {the calculated value} can be expected to approximate the relevant population value." In other words, the reliability of the calculated standard deviations based on the full population of sale prices to each group is identical. Because the

---

[1] This is significance in the plain language sense, not in the statistical sense, as no distributional test is performed.

[2] Commerce then sums the volume of the sales whose Cohen's $d$ measure exceeds 0.8 and uses that to determine whether the volume of sales whose prices differ significantly requires changes to the methodology used to calculate the margin of dumping.

reliability of the standard deviations based on full populations is equal, to calculate the denominator of the Cohen's *d* coefficient, Commerce finds that it is reasonable to weight these standard deviations equally, *i.e.*, a simple average, as presented in Dr. Cohen's equation 2.3.2, just as when the reliability is equal for standard deviations based on sampled data with equal sample sizes.

*Final Remand Results* at 12 (footnote omitted) (Appx2412). In contrast, the Taiwanese Respondents' insistence on the use of weighted average of the two groups' standard deviations ("SDs)" in the denominator of the Cohen's *d* measure using is unwarranted. The Taiwanese Respondents would assign weight based on the amount in kilograms of the sales falling within each group. This approach would be statistical malpractice. Neither the academic literature, nor general statistical principles, support this approach. What matters is the observed pricing *behavior*, which is what is being measured and analyzed by the Cohen's *d* test. The use of a simple average is entirely appropriate in instances when dealing with two groups of different population size but of equal importance, as is the case in Commerce's differential pricing analysis with the test and comparison groups.

The Taiwanese Respondents attempt to show how use of a simple average leads to irregular results while the use of a weighted average

does not, via five different illustrative examples.  Opening Br. at 30-36.

The first of these examples uses hypothetical data, while the remaining

four are based on the Taiwanese Respondents' actual sales data.  The

Taiwanese Respondents' self-selected examples comprise a miniscule

fraction of the full universe of its sales.  It is apropos of this appeal to

note that a sample of five datapoints cherry picked from a much larger

dataset can hardly be considered reliable for purposes of drawing

critically important conclusions.

The kilogram quantities of its examples are denoted by the "Q

Test" and "Q Comp" columns (*i.e.*, the quantities of the test and

comparison groups, respectively).  The Taiwanese Respondents' U.S.

sales database consists of [number] sales observations totaling

[      number      ] kilograms.[3]  In total, the sales quantity for the

Taiwanese Respondents' self-selected examples amounts to just

[number]  kilograms, or [%] percent of the Taiwanese Respondents'

---

[3] *See* Memorandum to the File, from Erin Kearney, Program Manager,
AD/CVD Operations, Office VI, *Placing Margin Calculations on the
Record* (July 11, 2022) (ACCESS Barcode: 4262242) at Attachment 5
(Appx2661).  The total kilogram quantity was calculated by summing
the column QTY2U in PT's U.S. sales database.

total sales quantity – a *de minimis* amount. These examples can hardly be considered representative.

If anything, the [number] percent figure *understates* the lack of representativeness of the Taiwanese Respondents' examples. This is because, as discussed above, each sale is considered multiple times within the comparisons made in the differential pricing methodology. In other words, the [number] sales were used a total of [number] times in the base groups: [number] by region, [number] by period, and [number] by purchaser.[4] PT did not provide the total number of sales observations considered within its four examples using actual data or other basic details (*e.g.*, whether the examples were based on comparison by customer, purchases, or time period), thus preventing a thorough and transparent analysis of its methodologies and results. Nonetheless, based on the limited information PT did provide, one can at least ascertain the number of observations in the comparison (base) groups in the Taiwanese Respondents' second and fourth examples. In the second example, there are 13 observations in the comparison group,

---

[4] *Id.* at Attachment 2 (specifically, pages 91, 102, and 112 of the SAS log printout) (Appx2573, Appx2584, Appx2594, respectively).

and in the fourth example, there are two. Thus, in sum, sales

observations comprising the comparison groups in two of the examples

used by PT rely on a grand total of [ % ] *percent* of the times the

Taiwanese Respondents' sales observations were used overall in the

base groups for the differential pricing analysis. Statistically speaking,

the level of confidence one can have in any conclusions drawn from this

sample is extremely low.

Independent of the lack of reliability of the Taiwanese

Respondents' self-selected examples, Commerce effectively refuted the

Taiwanese Respondents' arguments with the explanations it provided

on pages 51-54 (Appx2451-2454) of the *Final Remand Results*. In sum,

Commerce has demonstrated that a simple average is appropriate for

use in the Cohen's $d$ test as part of the differential pricing analysis.

Mid Continent again notes that the Taiwanese Respondents'

proposal of using a weighted average based on the physical weights of

sales within each group as the denominator of $d$ opens the door to

manipulation. For example, assume a foreign supplier sells a product

to purchaser, region, or in time period $B$ and does so with a large

contrasting volume $W_A$ relative to $W_B$. Since $W_A$ is in the numerator of

the denominator, this has the effect of lowering Cohen's $d$ compared to using the simple average. So even if $m_A - m_B$ is relatively large, this supplier has the ability to manipulate the measure of $d$ by changing the relative volume since this method gives more weight to standard deviations from smaller groups when those smaller groups are from larger sales. Consider the following two scenarios where the mean price difference ($m_A$ and $m_B$) and the within-group standard deviations ($\sigma^2{}_A$ and $\sigma^2{}_B$) remain the same but the volume ($W_A$ and $W_B$) for the higher priced group of sales is increased:

$$m_A = 4.3, m_B = 3, \sigma^2{}_A = 3, \sigma^2{}_B = 2, W_A = 10, W_B = 10$$

$$d_W = \frac{4.3 - 3}{\sqrt{\dfrac{10}{10 + 10} \times 3 + \dfrac{10}{10 + 10} \times 2}} = \textcolor{red}{0.8221922}$$

$$m_A = 4.3, m_B = 3, \sigma^2{}_A = 3, \sigma^2{}_B = 2, W_A = 30, W_B = 10$$

$$d_W = \frac{4.3 - 3}{\sqrt{\dfrac{30}{30 + 10} \times 3 + \dfrac{10}{30 + 10} \times 2}} = \textcolor{red}{0.7839295}$$

As this shows, in the first case the value of Cohen's $d$ exceeds the "large" effect size 0.8 threshold, but with the same pricing difference the manipulated volume value in the calculation of $d$ does not. This obviously is a simplified example, but it illustrates that a supplier can

manipulate sales volume to alter the value of $d$ when this approach is used. Given the prevalence and sophistication of many antidumping respondents' "dump-proofing" activities, this scenario is not far-fetched. It is certainly mathematically possible to conceal price manipulation as a seller. Mid Continent respectfully submits that any approach that would enable such manipulation would be inherently *unreasonable*, especially if it fails to hew to the statutory requirement that it examine prices *per se*. In contrast, the simple average used by Commerce would obviate the concern about the potential manipulation of sales quantities that is an inherent characteristic of the Taiwanese Respondents' preferred method. In short, Commerce's approach represents a reasonable, discretionary choice to fulfill its statutory authority, enhance the effectiveness of the antidumping laws, and mitigate against manipulation.

## III. WEIGHTED AVERAGING IS NOT APPROPRIATE FOR THE MANNER IN WHICH COMMERCE APPLIES THE COHEN'S *D* MEASURE

The Taiwan Respondents suggest using volume weighting in the calculation of the denominator of $d$.  Expressed mathematically, this approach is described as follows:

$$d_W = \frac{m_A - m_B}{\sigma_v} = \frac{m_A - m_B}{\sqrt{\frac{W_A}{W_A - W_B}\sigma^2{}_A + \frac{W_B}{W_A - W_B}\sigma^2{}_B}}$$

where $W_A$ is the total kilogram weights in the test group and $W_B$ is the total kilogram weights in the comparison group.  The denominator is therefore a weighted average based on the physical weight (in kilograms) of the sales in each group.  This approach, however, produces exactly the opposite of what Commerce is trying to measure.

Suppose that a foreign supplier sells a product to a purchaser, region, or in time period $B$ and does so with a large contrasting volume $W_A$ relative to $W_B$.  Since $W_A$ is in the numerator of the denominator, this has the effect of reducing the Cohen's $d$ measure compared to using the simple average. So even if $m_A - m_B$ is relatively large, this supplier has the ability to manipulate the Cohen's $d$ coefficient by changing the relative volume since this method gives more weight to standard

deviations from smaller groups when those smaller groups are from larger sales.

Commerce effectively countered the five illustrative examples from the case data that the Taiwanese Respondents offered to show the weighted averaging leads to reasonable results but that using a simple average does not. *Final Remand Results* at 36-38 (Appx2436-2438). Mid Continent agrees with and supports Commerce's analysis with respect to this matter. Additionally, the example above demonstrating the potential for manipulation underscores the flawed nature of the Taiwan Respondents' proposal.

## IV. USING THE STANDARD DEVIATION OF THE ENTIRE POPULATION IN THE DENOMINATOR IS NOT APPROPRIATE

In *Mid Continent V*, the court observed that:

> Commerce has not explained why the basic choice of weighted averaging of unequal-size groups fails to apply to the present context. The cited literature nowhere suggests simple averaging for unequal-size groups. Indeed, when the entire population is known, the cited literature points toward using the standard deviation of the entire population as the denominator in Cohen's $d$ – which Commerce has not done.

*Mid Continent V*, 31 F.4th at 1380. In other words, the court observed

that when two populations are used, instead of two samples, which is

the case here, Cohen's *d* may be defined as

$$d = \frac{\mu_1 - \mu_2}{\sigma}$$

where $\mu_1$ is the mean of the first population and $\mu_2$ is the mean of the

second population. Sigma, $\sigma$, is the population standard deviation –

*which is assumed to be "common" (equal) in both populations.* In other

words, it is assumed that $\sigma_1 = \sigma_2 = \sigma$ in this context.

Commerce succinctly described the reasons not to use the

standard deviation of the entire population, stating:

> the option to use a single standard deviation of all data
> when the data are explicitly separated into two
> separate populations is not a reasonable approach for
> Commerce's Cohen's *d* test. The single standard
> deviation causes the denominator of the Cohen's *d*
> coefficient to reflect not just the dispersion of the data
> within each group, but also the dispersion of the data
> between the two groups. Commerce uses effect size,
> the result of the Cohen's *d* test, to examine the
> difference in the mean prices to each group relative
> only to the dispersion of prices within both groups.
> The significance in the difference in the mean prices
> cannot be accurately gauged when that difference in
> the prices between the two groups is part of the
> "yardstick" used to assess that difference as achieved
> with a single standard deviation . . ..

*Final Remand Results* at 17-18 (Appx2417-2418). As this shows, the Court's suggestion that Commerce use the standard deviation of the entire population is not appropriate given the context of Commerce's analysis.

The Taiwanese Respondents argue that Commerce failed to recognize certain aspects pertaining to the use of the single standard deviation of the entire population. Opening Br. at 55-56. The Taiwanese Respondents' arguments are not persuasive. The Taiwanese Respondents claim that

> Commerce also fails to recognize that the Cohen's *d* Test Group and Comparison Group are not distinctly different datasets. As discussed above, each sale (i.e., count) is a member of multiple groups, both test and comparison. Thus, the dispersion of the data between each group changes depending on the composition of the group. These differences are arbitrary (and unpredictable) factors in Commerce's DP analysis. They have little or no economic meaning but are merely artifacts of the economically arbitrary splitting and re-splitting of one population of transaction data into various test and comparison groups.

*Id.*

The "arbitrary" differences the Taiwanese Respondents take issue with here, in fact, reflect that statutory directive to analyze whether the prices of a particular product differ by customer, region, or time period.

19 U.S.C. 1677f-1(d)(1)(B)(i)  By taking issue with "economically arbitrary splitting and re-splitting," the Taiwanese Respondents are in effect arguing against the statute itself in the way it directs Commerce to analyze targeted dumping.

The Taiwanese Respondents go on to claim that

> relying on the standard deviation for the entire population is consistent with weighted averaging insofar as both methodologies accord equal weight to each kilogram of nails being analyzed regardless of the group in which the sale falls.  Because both methodologies accord equal weight to each kilogram sold, and because both methodologies are otherwise consistent with Cohen's $d$ methodology for determining whether there are significant differences between two groups of data, both methodologies are reasonable.

> In contrast, in the SA methodology, a particular sale will receive more weight than other sales for certain comparisons, thereby strongly influencing the outcome, while in other comparisons the same sale will receive a low weight, thereby having little influence on the outcome. As a result, SA is an unreasonable and economically meaningless methodology for determining whether there are significant differences between prices, leading to unreasonable results.

Opening Br. at 56.

The Taiwanese Respondents' notion that weighted average is somehow consistent with using the standard deviation of the entire population is also unsupported.  In fact, its notion is entirely results-

driven as using the standard deviation of the entire population would also result in a *de minimis* margin. Again, the goal of Commerce's differential pricing methodology is to compare the prices of two groups, irrespective of the total quantity in kilograms of the sales within each group, and somehow standardize them to assess the difference between their respective means. A simple average accomplishes this, whereas using a single standard deviation would be an inappropriate commingling, as explained by Commerce. *Final Remand Results* at 17-18 (Appx2417-2418).

Mid Continent agrees with Commerce's analysis that this approach is not viable. *Final Remand Results* at 17-23 (Appx2417-2423). Indeed, the suggested approach is based on the assumption that the population standard deviation is the same in both populations. Whether the population standard deviation is indeed the "common" measure of variation across all populations needs to be questioned. If two populations are different in terms of their observation values, the population standard deviation will be skewed in favor of the group with a larger amount of variation among its observations. The pooled variance will be affected by the larger population size, which is contrary

to Commerce's goal of simply comparing *prices* regardless of the size (kilograms) of the associated sales. Commerce uses the average of both variances *to make it representative of both populations*.

For example, if $N_1 = 50, \sigma_1^2 = 10, N_2 = 200, and\ \sigma_2^2 = 15$, the pooled variance is $\sigma_p^2 = \frac{49*10+199*15}{248} = 14.01$, which is very close to the variance of the population with a larger size. The larger one of the population sizes is, the more weight is given to the variance of the larger group, and it will directly affect the values of the pooled standard deviation.

If the simple averaged variance was calculated, this value would be equal to $\frac{10+15}{2} = 12.5$, which is in the middle of the variances of two populations and as a result representative of both variances rather than being dominated by the variance of the larger population. Moreover, it bears reiterating that Commerce's calculation already incorporates different group sizes in the calculation of the average values used in the numerator of the effect size calculation. Additionally, group sizes are considered when calculating the standard deviation values used to calculate the denominator of the effect size.

As this shows, using the standard deviation of the entire population is not appropriate given the context of Commerce's analysis;

due to the nature of the data being analyzed, one group will almost always have a much larger number of sales, and thus have an outsized influence on the calculation of the overall standard deviation. This would undermine the ultimate goal of Commerce's evaluation of the data, which is to determine whether the means of the two groups individually are different enough such that they cross a preselected effect size threshold (currently 0.8) and are therefore differentially priced.

Finally, it was implied in *Mid Continent V* that the quantity/population size is ignored if the square root of the average of variances is used instead of the pooled standard deviation. *Mid Continent V*, 31 F.4th at 1378-1379. A suggestion to this effect would not be correct, because the population size is used in the calculation of each mean and standard deviation and hence in the calculation of Cohen's *d*:

$$\sigma_1^2 = \frac{\sum_{i=1}^{N_1}(x_i - \mu_1)^2}{N_1},$$

and

$$\sigma_2^2 = \frac{\sum_{i=1}^{N_2}(x_i - \mu_2)^2}{N_2},$$

Both have their respective population size ($N_1$ is the population mean of the first group and $N_2$ is the population mean of the second group) in the denominator. The equations below show algebraically how they are reflected in the calculation of the Cohen's $d$ measure used by Commerce:

$$Cohen's\ d = \frac{\mu_1 - \mu_2}{\sqrt{\frac{\sigma_1^2 + \sigma_2^2}{2}}} = \frac{\frac{\sum_{i=1}^{N_1} x_i}{N_1} - \frac{\sum_{i=1}^{N_2} x_i}{N_2}}{\sqrt{\frac{\sum_{i=1}^{N_1}(x_i - \mu_1)^2}{N_1} + \frac{\sum_{i=1}^{N_2}(x_i - \mu_2)^2}{N_2}} \Big/ 2}$$

$$= \frac{\frac{N_2 \sum_{i=1}^{N_1} x_i - N_1 \sum_{i=1}^{N_2} x_i}{N_1 N_2}}{\sqrt{\frac{N_2 \sum_{i=1}^{N_1}(x_i - \mu_1)^2 + N_1 \sum_{i=1}^{N_2}(x_i - \mu_2)^2}{2 N_1 N_2}}}$$

$$= \frac{\sqrt{\frac{N_2 \sum_{i=1}^{N_1} x_i - N_1 \sum_{i=1}^{N_2} x_i}{N_1 N_2}} * \sqrt{\frac{N_2 \sum_{i=1}^{N_1} x_i - N_1 \sum_{i=1}^{N_2} x_i}{N_1 N_2}}}{\sqrt{\frac{N_2 \sum_{i=1}^{N_1}(x_i - \mu_1)^2 + N_1 \sum_{i=1}^{N_2}(x_i - \mu_2)^2}{2 N_1 N_2}}}$$

$$= \frac{\frac{\sqrt{N_2 \sum_{i=1}^{N_1} x_i - N_1 \sum_{i=1}^{N_2} x_i}}{\sqrt{N_1 N_2}} * \frac{\sqrt{N_2 \sum_{i=1}^{N_1} x_i - N_1 \sum_{i=1}^{N_2} x_i}}{\sqrt{N_1 N_2}}}{\frac{\sqrt{N_2 \sum_{i=1}^{N_1}(x_i - \mu_1)^2 + N_1 \sum_{i=1}^{N_2}(x_i - \mu_2)^2}}{\sqrt{2} * \sqrt{N_1 N_2}}}$$

$$= \frac{\dfrac{N_2 \sum_{i=1}^{N_1} x_i - N_1 \sum_{i=1}^{N_2} x_i}{\sqrt{N_1 N_2}}}{\dfrac{\sqrt{N_2 \sum_{i=1}^{N_1}(x_i - \mu_1)^2 + N_1 \sum_{i=1}^{N_2}(x_i - \mu_2)^2}}{\sqrt{2}}}$$

$$= \frac{\sqrt{2} * \left(N_2 \sum_{i=1}^{N_1} x_i - N_1 \sum_{i=1}^{N_2} x_i\right)}{\textcolor{red}{\sqrt{N_1 N_2}} * \sqrt{N_2 \sum_{i=1}^{N_1}(x_i - \mu_1)^2 + N_1 \sum_{i=1}^{N_2}(x_i - \mu_2)^2}}$$

As it can be seen from the final equation, the population sizes are considered and used in the calculation of the Cohen's $d$ measure used by Commerce, and by using this version, instead of the pooled version, the population size information is not lost.

## V.   THE TRADE COURT'S DECISION SHOULD BE AFFIRMED

The Trade Court correctly determined that Commerce had provided a reasoned explanation for its decision to adapt the approach identified in the acknowledged literature, and its decision should be affirmed.

The Trade Court provided an insightful analysis of Commerce's Final Remand Results, highlighting how the agency distilled underlying principles from the academic literature, namely the use of a simple average when sample sizes are the same because they have equal reliability, that full populations of data are inherently 100 percent

reliable, and hence that a simple average can be used with full

populations and given the context of Commerce's antidumping analysis.

In sum:

> Responding to the Court of Appeals, Commerce has
> provided an explanation that logically connects the
> relevance of full populations to the use of simple
> averaging. Commerce is not relying solely upon the
> academic literature to support its choice, but rather
> argues that the principle it derives from the academic
> literature leads to a logical conclusion that simple
> averaging in this case is a reasonable choice. Fourth
> Remand Results at 12–13, 22–25. Commerce identifies
> where simple averaging is supported by the literature,
> extrapolates a rationale for why simple averaging is
> appropriate, and then applies that rationale to the
> circumstances before Commerce. Although there may
> be other reasonable alternatives, the Court cannot find
> fault with Commerce's logic here. Commerce's
> reliability analysis is reasonable.

*Mid Continent Steel & Wire, Inc. v. United States*, 680 F.Supp.3d 1346

1353 (Ct. Int'l Trade 2024).

The Trade Court specifically notes that

> Plaintiffs do not challenge the premise upon which
> Commerce relies, *i.e.*, that it is appropriate to use a
> simple average for equal sample sizes because the two
> samples have equal reliability. *** Rather, Plaintiffs
> argue that Commerce's "analysis proves nothing." ***
> Plaintiffs state that reliability or precision is
> dependent on a number of factors, at least with respect
> to samples. *** Plaintiffs contend that the reliability of
> a sample cannot be compared to the reliability of a full

> population. \*\*\* However, Commerce is not comparing the reliability of a sample to the reliability of a full population, rather Commerce argues that samples of equal sizes have equal reliability and full populations have equal reliability. Fourth Remand Results at 12–14. Therefore, Commerce reasons that if it is appropriate to use a simple average where sample sizes are equal, because of the equal reliability, then it is appropriate to use a simple average where full populations are being used.

*Id.*, 680 F.Supp.3d at 1354-1355.

As discussed above, Commerce's analysis provides a reasonable justification for its decision to depart from what the acknowledged literature teaches concerning the Cohen's *d* coefficient. The Trade Court's decision reviewed the agency's analysis and found it sufficient to warrant affirmance. The Trade Court also considered and rejected many if not all of the same arguments presented to this Court by the Taiwanese Respondents. The Trade Court's decision should be affirmed.

## VI. THE ARGUMENTS OF THE TAIWANESE RESPONDENTS AND *AMICI* ARE WITHOUT MERIT

Reading the Taiwanese Respondents' opening brief gives one a sense of *deja vue*. Most of the arguments and analysis have been presented to this court in the past, and have little bearing on the issue before the court. It is not until page 49 of their brief that the Taiwanese

Respondents' directly address and challenge Commerce's determination that is before the Court. The Taiwanese respondents offer 10 enumerated reasons why they feel Commerce's final remand determination fails to provide the reasonable justification that this Court required.

First, they claim that Commerce has failed to "provid{e} an adequate and reasonable justification as to **why** an SA yardstick, rather than a WA yardstick or a combined SD yardstick, **should be** used." Opening Br. at 49 (emphasis in original). Of course, Commerce did exactly that in its final remand determination – that was the entire point of the remand proceeding.

Second, they claim that "reliability considerations do not favor one methodology over another." *Id.* at 49. This misses the point of Commerce's analysis, which demonstrated that because the groups of data being compared consist of two full populations, they both possess complete reliability, rendering reasonable the use of a simple average when calculating the denominator of the Cohen's $d$ coefficient.

Third, they argue that "equality in reliability is not relevant in determining whether the Cohen's $d$ denominator should be based on

WA or SA." *Id.* at 50. Again, this misses the point of Commerce's reliability analysis. Commerce already justified its decision to rely on a simple average, which allows it to avoid the distortions that would result from using a weighted average. Commerce here has tied its use of a simple average in the Cohen's *d* denominator to use of a simple average in the acknowledged literature when the samples being compares are equally reliable.

Fourth, the Taiwanese Respondents take issue with the Trade Court's observation that they "do not challenge . . . {Commerce's premise that} . . . it is appropriate to use a simple average for equal sample sizes because the two samples have equal reliability." *Id.* at 50, citing Appx15. They claim that "reliance on SA is appropriate when the sample size and SDs of the two groups are the same, regardless of whether one sample is more reliable than the other." *Id.* at 50-51. How this undermines the reasonableness of Commerce's justification is unclear, unless the Taiwanese Respondents are claiming that a simple average approach can only be used when comparing samples (not populations) of equal sizes.

Fifth, they claim that "if *Cohen/Coe/Ellis* had based their acceptance of SA on reliability considerations, they would have expressly said so in their papers ..." *Id.* at 51. This is meritless, unsupported, and flies in the face of the entire point of statistical analysis. Reliability considerations animate the entire world of statistics; such considerations drive everything from sampling methodologies, to the t-test, to power tables, to the Cohen's $d$ analysis, and more. Commerce has come to the root of its rationale for using a simple average in its version of the Cohen's $d$ analysis. Its justification is reasonable, makes sense, and should be affirmed.

Sixth, the Taiwanese Respondents argue that a simple average cannot be used because the test and comparison groups "are not equal in size", whether in terms of the number of sales or the number of kilograms.[5] *Id.* at 51. Again, this misses the point. Commerce's use of the simple average is based on the fact that full populations of data are

---

[5] While the Taiwanese Respondents make this claim as a matter of certainty, this is not necessarily the case. It is possible for test and comparison groups to have the same number of sales and/or the same quantity by weight. It all just depends on the dataset being analyzed.

inherently 100 percent reliable, and thus support the use of a simple average.

Seventh, the Taiwanese Respondents claim that "Commerce's premise that equality in counts in a sampling analysis in which each count is equal in weight justifies relying on an SA methodology in a full population analysis – where each count has a different weight – does not support its conclusion." *Id.* at 52. This reflects a fundamental misunderstanding of Commerce's rationale, which is based on comparing two complete populations (not samples, and not necessarily of equal sizes), which are inherently 100 percent reliable because they include 100 percent of each population's data in their respective group.

Eighth, the Taiwanese Respondents claim that "the reliability of samples cannot be readily compared to the reliability of a full population, let alone be a reason why the standard deviation yardstick of a full population can be based on simple averaging of the SDs of two unequal groups." *Id.* at 53. Here, too, the Taiwanese Respondents miss the point. Commerce distilled underlying principles from the acknowledged literature that are equally relevant and applicable to the analysis at hand.

Ninth, the Taiwanese Respondents claim that "the fact that two groups in a sample are equal in size does not support the proposition that significant differences in two groups of a full population, with zero errors in each, can be identified by taking a simple average of the SD of each group." *Id.* at 53. Beyond this cryptic statement, no support or authority is provided to assess the merits of this claim.

Tenth and finally, the Taiwanese Respondents claim that "the fact that the Test Group and Comparison Group of a full population may be equally reliable 'provides no apparent reason for assigning equal weight to each group's standard deviation when computing the pooled standard deviation.'" *Id.* at 53. This fails to acknowledge, much less address, the extensive analysis and comments provided by Commerce and the Trade Court on this issue. Simply repeating such claims does not render them true or authoritative.

The Taiwanese respondents next argue, again without support or authority, that a "respondent's pricing behavior cannot be separated from the data which resulted from the behavior, or from the data which led to the behavior." *Id.* at 54. This claim is entirely at odds with the statute, which directs Commerce to assess whether a pattern of *prices*

that differ significantly by customer, region, or time period exists. As noted above, the statutory language refers only to prices, and not to "weighted average prices". Other parts of the statute specifically refer to weighted averaging when Congress intended that approach to be used. For example, 19 U.S.C. § 1673b, dealing with preliminary determinations in antidumping investigations, specifically directs Commerce to "determine an estimated weighted average dumping margin for each exporter or producer individually investigated …" 19 U.S.C. § 1673b(d)(1)(A)(i). The statutory provision concerning final determinations contains identical language. *See* 19 U.S.C. § 1673d(c)(1)(B)(i)(I). If Congress intended Commerce to rely on weighted averaging in its analysis of differential pricing, it would have said so in the statute. If anything, Commerce's approach is consistent with, and indeed required by, the statute.

The arguments made by *amici* fare little better. *Amici* first argue that Commerce's use of a simple average in the denominator is unreasonable because "the literature *does* address calculating the Cohen's *d* denominator for full populations." *Amici* Br. at 20 (emphasis in original). *Amici's* argument fails, because the Court already has

acknowledged that Commerce may depart from the acknowledged

literature, so long as it provides a reasonable justification.

Second, *amici* argue that Commerce's "reliability" rationale is not

reasonable, because it "simply has no basis in the literature or logic."

*Amici* Br. at 24. "Commerce decides that the reason for simple

averaging when dealing with two groups of equal size is not the equal

size itself, but rather the equal reliability of estimated standard

deviations that the equal size implies." *Id. Amici* then contend,

without any support or authority, that:

> Of course, neither Cohen nor any other source makes
> this connection, which should not be surprising
> because it makes no sense. When dealing with two
> groups of the same size, a simple average is the same
> as a weighted average based on size. Cohen is
> weighting by size, not by reliability.

*Id.* at 24. Of course, this misses the fundamental point that reliability

is a function of how much of a population is represented in the data –

where the data account for 100 percent of the population, they are

inherently 100 percent reliable.

*Amici* then challenge Commerce's ability to rely on the concept of

reliability at all when justifying its approach, arguing that "{t}he

concept of reliability simply does not apply when working solely with

full populations." *Id.* at 26. Mid Continent agrees that when working with full populations, the issue of reliability is less of a concern than when working with samples, because full populations inherently are 100 percent reliable.

*Amici* then describe Commerce's rationale as a "meaningless tautology", claiming that "Commerce's insistence that reliability is the actual, though unarticulated, basis for weighting unequal standard deviations does not 'go beyond' the statistics literature, it runs directly contrary to the statistics literature." *Id.* at 26-27. *Amici* contend that "{t}he statistics literature is clear that pooling unequal standard deviations in the calculation of Cohen's *d* requires weighting based on group size." *Id.* at 26 (footnote omitted). This argument also fails, because the Court already has recognized that Commerce has the authority to go beyond the acknowledged literature so long as it provides a reasonable justification, as it has done in this case.

Ultimately, *amici's* arguments reflect the position that Commerce should be required to rely on one of the specifically enumerated formulae from the established literature. This position is at odds with the Court's prior rulings and cannot stand. Commerce has provided a

reasonable justification for its departure from the established literature, and its determination should be affirmed.

## VII. CONCLUSION

For the foregoing reasons, the decision of the Trade Court should be affirmed, as should Commerce's determination to use a simple average when calculating the denominator of the Cohen's d coefficient as part of its differential pricing analysis.

Respectfully submitted,

*/s/ Adam H. Gordon*
Adam H. Gordon
Jennifer M. Smith-Veluz, Esq.
Benjamin J. Bay, Esq.
Kieran O'Connell, Esq.
**THE BRISTOL GROUP PLLC**
*Counsel to Mid Continent Steel &*
*Wire, Inc.*

Dated: August 15, 2024

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

1.     This brief complies with the type-volume limitation of Federal Circuit Rule 28.1(b)(1)(A).

This brief contains 6,832 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

This brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Century Schoolbook font.


*/s/ Adam H. Gordon*
Adam H. Gordon
**THE BRISTOL GROUP PLLC**
*Counsel to Mid Continent Steel & Wire, Inc.*

Date: August 15, 2024

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF CONFIDENTIAL MATERIAL

**Case Number:** 24-1556

**Short Case Caption:** Mid Continent Steel & Wire, Inc.

---

**Instructions:** When computing a confidential word count, Fed. Cir. R. 25.1(d)(1)(C) applies the following exclusions:

- Only count each unique word or number once (repeated uses of the same word do not count more than once).

- For a responsive filing, do not count words marked confidential for the first time in the preceding filing.

The limitations of Fed. Cir. R. 25.1(d)(1) do not apply to appendices; attachments; exhibits; and addenda. *See* Fed. Cir. R. 25.1(d)(1)(D).

---

The foregoing document contains __9__ number of unique words (including numbers) marked confidential.

- [ ] This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A).

- [x] This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b).

- [ ] This number exceeds the maximum permitted by Federal Circuit Rule 25.1(d)(1), and the filing is accompanied by a motion to waive the confidentiality requirements.

Date: 08/15/2024

Signature: /s/ Adam H. Gordon

Name: Adam H. Gordon

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of August, 2024, a copy of

the foregoing was served on the following parties by operation of the

Court's electronic-filing system:

On behalf of Defendant-Appellee
United States
Mikki Cottet
Senior Trial Attorney
U.S. Department of Justice
PO Box 480
Ben Franklin Station
Washington, DC 20044

On behalf of Defendant-Appellee
United States
Vania Wang
General Attorney
U.S. Department of Commerce
1401 Constitution Avenue, NW
Washington, DC 20230

On behalf of Defendants –
Appellants PT Enterprise Inc., *et al.*
Ned H. Marshak
Grunfeld, Desiderio, Lebowitz,
Silverman & Klestadt LLP
599 Lexington Avenue
36th Floor
New York, NY 10022

On behalf of Amicus Curiae
Government of Canada
Eric S. Parnes
Blank Rome LLP
1825 Eye Street NW
Washington, DC 20006

On behalf of Amicus Curiae
West Fraser Mills Ltd.
Donald Harrison
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, NW
Washington, DC 20036-5306

On behalf of Amici Curiae
Tolko Industries Ltd., *et al.*
Henry David Almond
Arnold & Porter Kaye Scholer
LLP
601 Massachusetts Avenue, NW
Washington, DC 20001-3743

On behalf of Amici Curiae
<u>Canfor Corp., *et al.*</u>
R. Will Planert
Morris Manning & Martin LLP
1333 New Hampshire Avenue,
NW
Suite 800
Washington, DC 20036

<u>On behalf of Amicus Curiae</u>
<u>Resolute FP Canada Inc.</u>
Elliot Feldman
Baker & Hostetler LLP
1050 Connecticut Avenue, NW
Washington Square
Washington, DC 20036

<u>On behalf of Amicus Curiae</u>
<u>J.D. Irving, Limited</u>
Jay Charles Campbell
White & Case LLP
701 13th Street, NW
Washington, DC 20005-380

*/s/ Adam H. Gordon*
Adam H. Gordon
**THE BRISTOL GROUP PLLC**
*Counsel to Plaintiff-Appellee Mid
Continent Steel & Wire, Inc.*

Dated: August 15, 2024