# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

**MID CONTINENT STEEL & WIRE, INC.,**
*Plaintiff-Appellee*

**v.**

**UNITED STATES,**
*Defendant-Appellee,*

**PT ENTERPRISE INC., PRO-TEAM COIL NAIL ENTERPRISE INC., UNICATCH INDUSTRIAL CO., LTD., WTA INTERNATIONAL CO., LTD., ZON MON CO., LTD., HOR LIANG INDUSTRIAL CORPORATION, PRESIDENT INDUSTRIAL INC., LIANG CHYUAN INDUSTRIAL CO., LTD.**
*Defendants-Appellants*

On Appeal from the United States Court of International Trade in Court Nos. 1:15-cv-00213-CRK and 1:15-cv-00220-CRK, Judge Claire R. Kelly

## MOTION FOR LEAVE TO FILE BRIEF OF *AMICUS CURIAE* THE COMMITTEE OVERSEEING ACTION FOR LUMBER INTERNATIONAL TRADE INVESTIGATIONS OR NEGOTIATIONS IN SUPPORT OF DEFENDANT-APPELLEE

David A. Yocis
Whitney M. Rolig

**PICARD KENTZ & ROWE LLP**
1155 Connecticut Ave., NW
Suite 700
Washington, DC 20036
(202) 331-4040

*Counsel to the COALITION*

August 22, 2024

Pursuant to Federal Rule of Appellate Procedure 29(a)(3), the Committee Overseeing Action for Lumber International Trade Investigations or Negotiations ("COALITION") respectfully moves for leave to file an *amicus curiae* brief in support of Defendant-Appellee the United States and supporting affirmance of the differential pricing methodology subject to this appeal. The proposed brief is attached to this Motion. <u>See</u> Attachment, Brief of Committee Overseeing Action for Lumber International Trade Investigations or Negotiations as *Amicus Curiae* In Support of Defendant-Appellee. Defendant-Appellee the United States and Plaintiff-Appellee Mid Continent Steel & Wire, Inc. consent to the COALITION's request to file an *amicus curiae* brief. Defendants-Appellants do not oppose this motion.

Below, the COALITION asserts its interest in this case and the reasons why the proposed *amicus curiae* brief is desirable and relevant to this Court's disposition of the case. <u>See</u> Fed. R. App. P. 29(a)(3).

## MOVANT'S INTERESTS

The COALITION is an interested party in separate antidumping proceedings before the U.S. Department of Commerce ("Commerce") concerning softwood lumber from Canada. <u>See, e.g.</u>, <u>Certain Softwood Lumber Products From Canada: Final Results of Antidumping Duty Administrative Review, Partial Rescission of Administrative Review, and Final Determination of No Shipments; 2022</u>, 89 Fed.

Reg. 67,062 (Dep't Commerce Aug. 19, 2024) and accompanying Issues and Decision Memorandum ("Lumber AD AR5 IDM"); Certain Softwood Lumber Products From Canada: Antidumping Duty Order and Partial Amended Final Determination, 83 Fed. Reg. 350 (Dep't Commerce Jan. 3, 2018). The issue presented in this appeal challenges Commerce's use of the Cohen's $d$ test as part of the agency's differential pricing methodology. See ECF 30 at 2-3. The COALITION has defended Commerce's use of this well-established methodology before binational panels convened under the North America Free Trade Agreement ("NAFTA") and the United States-Mexico-Canada Agreement ("USMCA"),[1] and before the U.S. Court of International Trade.[2] Entering this appeal as an *amicus curiae* is of particular interest to the COALITION because the final outcome of this appeal may be binding on those pending challenges.

---

[1] Certain Softwood Lumber Products From Canada: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2020, USMCA No. USA-CDA-2022-10.12-02; Certain Softwood Lumber Products from Canada: Final Results of Antidumping Duty Administrative Review; 2019, USMCA No. USA-CDA-2021-10.12-04; Softwood Lumber from Canada, Final Results of the Antidumping Duty Administrative Review; 2017-2018, USMCA No. USA-CDA-2020-10.12-02; Softwood Lumber from Canada: Final Affirmative Determination of Sales at Less Than Fair Value and Affirmative Final Determination of Critical Circumstances, NAFTA No. USA-CDA-2017-1904-03.

[2] See Resolute FP Canada Inc. v. United States, CIT Ct. No. 23-00206-JAR.

## THE PROPOSED *AMICUS CURIAE* BRIEF IS RELEVANT AND DESIRABLE

The COALITION's proposed *amicus curiae* brief is relevant and desirable because it provides this Court with information supporting the validity of the differential pricing methodology and Commerce's authority to rely on such calculations when determining the antidumping duty rate. The COALITION believes that such detailed arguments in support of Commerce's practice will assist the Court's assessment of the lawfulness of the differential pricing methodology.

Additionally, the Government of Canada and other accompanying *amici* ("the Canadian *amici*") submitted an *amici curiae* brief in support of Defendants-Appellants and urging reversal in this matter. See ECF 28, ECF 32. Specifically, the Canadian *amici* put forth statistical literature pertaining to the Cohen's *d* test, asserting that Commerce's methodology is flawed. These same arguments have been rebutted by the COALITION and thoroughly addressed by Commerce in numerous segments of the softwood lumber proceeding. See, e.g., Lumber AD AR5 IDM at Comments 16-23; Certain Softwood Lumber Products From Canada: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2021, 88 Fed. Reg. 50,106 (Dep't Commerce Aug. 1, 2023) and accompanying Issues and Decision Memorandum at Comments 2-7. The COALITION's proposed *amicus curiae* brief is therefore particularly relevant and desirable for purposes of addressing the assertions made by the

Canadian *amici* and contributing to the Court's understanding of the issues raised in this appeal.

## CONCLUSION

For the foregoing reasons, the COALITION respectfully requests that this Court grant leave to file an *amicus curiae* brief in support of Defendant-Appellee United States and supporting affirmance of the differential pricing methodology subject to this appeal.

Respectfully submitted,

/s/  David A. Yocis

David A. Yocis
Whitney M. Rolig

**PICARD KENTZ & ROWE LLP**
1155 Connecticut Ave., NW
Suite 700
Washington, DC 20036

*Counsel to the COALITION*

August 22, 2024

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

|  |  |
|---|---|
| **Case Number** | 2024-1556 |
| **Short Case Caption** | Mid Continent Steel v. United States |
| **Filing Party/Entity** | Committee Overseeing Action for Lumber International Trade Investigations or Negotiations ("COALITION") |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 08/22/2024

Signature: /s/ Whitney M. Rolig

Name: Whitney M. Rolig

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☑ None/Not Applicable |
| Committee Overseeing Action for Lumber International Trade Investigations or Negotiations ("COALITION") | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☑     None/Not Applicable             ☐     Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐   Yes (file separate notice; see below)   ☐   No   ☑   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑     None/Not Applicable             ☐     Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

**Case Number:** 2024-1556

**Short Case Caption:** Mid Continent Steel & Wire, Inc. v. United States

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes _____778_____ words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 08/22/2024

Signature: /s/ Whitney M. Rolig

Name: Whitney M. Rolig

# PUBLIC CERTIFICATE OF SERVICE

## <u>MID CONTINENT STEEL & WIRE, INC. v. UNITED STATES, 2024-1556</u>

I hereby certify under penalty of perjury that on this 22nd day of August, 2024, a copy of the foregoing MOTION FOR LEAVE TO FILE BRIEF OF COMMITTEE OVERSEEING ACTION FOR LUMBER INTERNATIONAL TRADE INVESTIGATIONS OR NEGOTIATIONS AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANT-APPELLEE was filed electronically.


_X__ This filing was served electronically to all parties by operation of the Court's electronic filing system.

____ A copy of this filing was served via:

      ____ hand delivery

      ____ mail

      ____ third-party commercial carrier for delivery within 3 days

      ____ electronic means, with written consent of the party being served to the following addresses:


<u>/s/  David A. Yocis</u>

David A. Yocis

**PICARD KENTZ & ROWE LLP**
*Counsel to the COALITION*

2024-1556

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

**MID CONTINENT STEEL & WIRE, INC.,**
*Plaintiffs-Appellee*

**v.**

**UNITED STATES,**
*Defendant-Appellee,*

**PT ENTERPRISE INC., PRO-TEAM COIL NAIL ENTERPRISE INC.,
UNICATCH INDUSTRIAL CO., LTD., WTA INTERNATIONAL CO., LTD.,
ZON MON CO., LTD., HOR LIANG INDUSTRIAL CORPORATION,
PRESIDENT INDUSTRIAL INC., LIANG CHYUAN INDUSTRIAL CO., LTD.**
*Defendants-Appellants*

On Appeal from the United States Court of International Trade in
Court Nos. 1:15-cv-00213-CRK and 1:15-cv-00220-CRK,
Judge Claire R. Kelly

## BRIEF OF THE COMMITTEE OVERSEEING ACTION FOR LUMBER INTERNATIONAL TRADE INVESTIGATIONS OR NEGOTIATIONS AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANT-APPELLEE

David A. Yocis
Whitney M. Rolig

**PICARD KENTZ & ROWE LLP**
1155 Connecticut Ave., NW
Suite 700
Washington, DC 20036
(202) 331-4040

*Counsel to the COALITION*

August 22, 2024

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

**Case Number** 2024-1556

**Short Case Caption** Mid Continent Steel v. United States

**Filing Party/Entity** Committee Overseeing Action for Lumber International Trade Investigations or Negotiations ("COALITION")

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 08/22/2024

Signature: /s/ Whitney M. Rolig

Name: Whitney M. Rolig

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Committee Overseeing Action for Lumber International Trade Investigations or Negotiations ("COALITION") | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐     Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑     None/Not Applicable        ☐     Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐   Yes (file separate notice; see below)    ☐   No    ☑   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑     None/Not Applicable        ☐     Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

**TABLE OF CONTENTS** ........................................................ i

**TABLE OF AUTHORITIES** ................................................ ii

**INTEREST OF *AMICUS CURIAE*** .................................1

**INTRODUCTION AND SUMMARY OF ARGUMENT** ...................................3

**ARGUMENT** ......................................................................5

    I.    COMMERCE HAS ADEQUATELY EXPLAINED ITS RATIONALE FOR NOT USING THE STANDARD DEVIATION OF THE FULL SALES DATA SET AS THE DENOMINATOR FOR THE COHEN'S *D* TEST FOR PURPOSES OF THE DIFFERENTIAL PRICING ANALYSIS ............................5

    II.   COMMERCE HAS ADEQUATELY EXPLAINED WHY A SIMPLE AVERAGE IS PREFERABLE TO A WEIGHTED AVERAGE WHEN CALCULATING THE COHEN'S *D* DENOMINATOR FOR PURPOSES OF THE DIFFERENTIAL PRICING ANALYSIS .........8

    III.  COMMERCE'S CALCULATION OF THE COHEN'S *D* DENOMINATOR MUST BE EVALUATED IN THE CONTEXT OF THE DIFFERENTIAL PRICING MECHANISM AS A WHOLE....13

**CONCLUSION** ..................................................................16

# TABLE OF AUTHORITIES

**Cases**

<u>Mid Continent Steel & Wire, Inc. v. United States</u>, 31 F.4th 1367 (Fed. Cir. 2022) ................................................................................................ 5, 8, 13

<u>Stupp Corp. v. United States</u>, 5 F.4th 1341 (Fed. Cir. 2021) .................... 13, 15, 16

**Statutes**

19 U.S.C. § 1677f-1(d)(1)(B)(i)........................................................................ 5, 6, 14

**Administrative Determinations**

<u>Certain Softwood Lumber Products From Canada: Final Results of Antidumping Duty Administrative Review, Partial Rescission of Administrative Review, and Final Determination of No Shipments; 2022</u>, 89 Fed. Reg. 67,062 (Dep't Commerce Aug. 19, 2024).................................................................................2

<u>Certain Softwood Lumber Products From Canada: Antidumping Duty Order and Partial Amended Final Determination</u>, 83 Fed. Reg. 350 (Dep't Commerce Jan. 3, 2018) ...............................................................................................................1

**Scholarly Literature**

Jacob Cohen, <u>Statistical Power Analysis for the Behavioral Sciences</u> (1988)..........9

James Algina et al., <u>An Alternative to Cohen's Standardized Mean Difference Effect Size: A Robust Parameter and Confidence Interval in the Two Independent Groups Case</u>, 10 Psychological Methods 317 (2005).....................15

Johnson Ching-Hong Li, <u>Effect Size Measures in a Two-Independent-Samples Case with Nonnormal and Nonhomogenous Data</u>, 48 Behavioral Research 1560 (2015) .........................................................................................................15

Paul D. Ellis, <u>The Essential Guide to Effect Sizes: Statistical Power, Meta-Analysis, and the Interpretation of Research Results</u> (2010)...............................10

Robert Coe, "It's the Effect Size, Stupid: What Effect Size Is and Why It Is Important" (2002)...................................................................................................9

Robert J. Grissom & John J. Kim, <u>Effect Sizes for Research: Univariate and Multivariate</u> (2d ed. 2012) ..................................................................................15

# INTEREST OF *AMICUS CURIAE*[1]

*Amicus curiae* the Committee Overseeing Action for Lumber International Trade Investigations or Negotiations ("COALITION")[2] is an *ad hoc* association of U.S. softwood lumber producers, workers, landowners, and other interested parties working to address Canada's unfair lumber trade practices. The COALITION was the petitioner in the investigation that resulted in the imposition of antidumping duties on imports of certain softwood lumber products from Canada. See Certain Softwood Lumber Products From Canada: Antidumping Duty Order and Partial Amended Final Determination, 83 Fed. Reg. 350 (Dep't Commerce Jan. 3, 2018). The COALITION also participates in annual administrative reviews of the antidumping duty order to advocate for duties that offset Canada's unfair trade practices. See, e.g., Certain Softwood Lumber Products From Canada: Final Results of Antidumping Duty Administrative Review, Partial Rescission of Administrative Review, and Final Determination of No Shipments; 2022, 89 Fed.

---

[1] Defendant-Appellee the United States and Plaintiff-Appellee Mid Continent Steel & Wire, Inc. consent to the COALITION's request to file this *amicus* brief. Defendants-Appellants PT Enterprise Inc., Pro-Team Coil Nail Enterprise Inc., Unicatch Industrial Co., Ltd., WTA International Co., Ltd., Zon Mon Co., Ltd., Hor Liang Industrial Corporation, President Industrial Inc., and Liang Chyuan Industrial Co., Ltd., do not oppose the filing of this *amicus* brief.

[2] No counsel for a party authored this brief in whole or in part. No party or a party's counsel contributed money that was intended to fund preparing or submitting this brief. No person other than *amicus* or its counsel has contributed money that was intended to fund preparing or submitting this brief.

Reg. 67,062 (Dep't Commerce Aug. 19, 2024) and accompanying Issues and Decision Memorandum.  The application by the U.S. Department of Commerce ("Commerce") of its differential pricing analysis has been a key element of the effective enforcement of the antidumping law in these proceedings, and the COALITION has developed significant experience in analyzing and responding to the arguments of *amici curiae* the Government of Canada and several Canadian softwood lumber producers (the "Canadian *amici*") with respect to the differential pricing analysis.  See, e.g., id. at Comments 16-23.  To the extent that this Court finds the arguments of Canadian *amici* to be relevant in this case, the COALITION respectfully submits that this responsive argument will also be relevant to this Court's consideration.

Further, the COALITION is currently a participant defending Commerce's application of the differential pricing methodology in proceedings in the U.S. Court of International Trade and before binational panels formed under the North American Free Trade Agreement and the United States-Mexico-Canada Agreement.  See Resolute FP Canada Inc. v. United States, CIT Ct. No. 23-00206-JAR; Certain Softwood Lumber Products From Canada: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2020, USMCA No. USA-CDA-2022-10.12-02; Certain Softwood Lumber Products from Canada: Final Results of Antidumping Duty Administrative

Review; 2019, USMCA No. USA-CDA-2021-10.12-04; <u>Softwood Lumber from</u>
<u>Canada, Final Results of the Antidumping Duty Administrative Review; 2017-</u>
<u>2018</u>, USMCA No. USA-CDA-2020-10.12-02; <u>Softwood Lumber from Canada:</u>
<u>Final Affirmative Determination of Sales at Less Than Fair Value and Affirmative</u>
<u>Final Determination of Critical Circumstances</u>, NAFTA No. USA-CDA-2017-
1904-03.  The Court's holdings in this case may affect those proceedings.

## <u>INTRODUCTION AND SUMMARY OF ARGUMENT</u>

According to Canadian *amici*, there are four possible ways of calculating the
Cohen's *d* denominator.  One can use the standard deviation of the full population,
but if this parameter is unknown, one of three potential proxies can be used as an
alternative: the simple average of the standard deviation of the test and control
groups under certain very limited conditions, a weighted average of those two
groups' standard deviations under broader but still limited conditions, or the
standard deviation of the two groups comingled together.  Because Commerce uses
a simple average outside of the limited conditions that Canadian *amici* believe
appropriate for that option, Canadian *amici* argue that Commerce acts
unreasonably.

However, as Commerce explains in its remand determination at issue in this
appeal, the conditions for the use of simple (and weighted) averages apply
differently in the context of the statutory question the differential pricing

methodology is designed to answer.  In particular, the question addressed by much of the academic literature around the use of the Cohen's *d* coefficient–how to attribute statistical significance to the explanatory power of certain variables in sampled data–is not relevant to Commerce's determination of whether there is a pattern of significant price differences in a full dataset of all U.S. sales by an antidumping respondent along three specific axes.

Indeed, because the calculation of a single denominator for the entire U.S. dataset–either directly or indirectly by "comingling" the test and control groups, which always together comprise the full dataset–ignores the distribution of prices <u>within</u> each test group, such a methodology is unreasonable for Commerce's purposes.  Likewise, a weighted average standard deviation smooths out the impact of unusual price distributions within particular test groups–the very unusual distributions that can evidence patterns of significant price differences among test groups.

Canadian *amici* rely on a limited number of academic statistical sources without recognizing that the context of Commerce's differential pricing methodology is quite different from the statistical analysis of sample data that these sources are addressing.  By contrast, Commerce's remand determination draws from the principles behind those (and other) sources and applies them to the specific situation of the statutory criteria for employing the differential pricing

mechanism. Canadian *amici* therefore fail to undermine the reasonableness of Commerce's approach.

## ARGUMENT

### I. COMMERCE HAS ADEQUATELY EXPLAINED ITS RATIONALE FOR NOT USING THE STANDARD DEVIATION OF THE FULL SALES DATA SET AS THE DENOMINATOR FOR THE COHEN'S *d* TEST FOR PURPOSES OF THE DIFFERENTIAL PRICING ANALYSIS

In its most recent opinion in this case, this Court explained that "when the entire population is known, the cited literature points toward using the standard deviation of the entire population as the denominator in Cohen's *d*." Mid Continent Steel & Wire, Inc. v. United States, 31 F.4th 1367, 1380 (Fed. Cir. 2022) ("Mid Continent V") (Appx984). The Court recognized that Commerce "is not duty-bound to follow published literature when, *e.g.*, the literature is inapplicable to the specific problem before the agency," which in this case is "to implement the statutory mandate to determine when prices of certain groups 'differ significantly.'" Id. at 1380-81, Appx984-85 (citing 19 U.S.C. § 1677f-1(d)(1)(B)(i)). However, if Commerce departs from the literature it otherwise relies on to justify its approach, Commerce must provide a "reasonable justification" for such departure. Id. at 1381, Appx985.

In its remand determination, Commerce provides such a reasonable justification. Appx2413-17, Appx2432-44. Specifically, Commerce noted that the

5

standard deviation for any group "is based on the square of the difference between each observation within the group and that group's mean." Appx2416 (emphasis added). Because the standard deviation of any group is calculated using the mean of that group, the single standard deviation of all U.S. sales will be based on the mean of all U.S. sales, including the test group and the control group without differentiation. Thus, where the means of the test group and the control group differ, the dispersion of values within the overall group will also increase, thus masking the significance of the difference between the means. When using Cohen's *d* for the purposes of determining whether prices "differ significantly among purchasers, regions, or periods of time," 19 U.S.C. § 1677f-1(d)(1)(B)(i), Commerce appropriately considers it more relevant to measure the difference in the mean price for a given purchaser, region, or period of time and for other purchasers, regions, or periods of time with respect to the dispersion of data within each group, and not to the dispersion of data between them. Appx2417.

The Canadian *amici* complain that Commerce based its analysis on the assumption that the single standard deviation would be calculated based on "the single mean of the commingled observations in both groups," id., while ignoring the possibility of basing it on the mean of the total universe of all sales. Brief of Canadian *Amici Curiae* at 30-34. The Canadian *amici*'s objection is spurious for several reasons. First, and most importantly, because the entire universe of all U.S.

sales is in every case assigned either to the test group (a particular purchaser, region, or period of time) or to the control group (all other sales), the mean of the "commingled observations in both groups" and the mean of the total population are necessarily the same thing. Thus, Commerce's explanation applies with the same force to either calculation.

Indeed, the Canadian *amici* stress that it would be inappropriate to use a commingled mean of the test and control groups rather than the mean of the total population when "Commerce has the broader set of data from which the test and comparison groups were selected." Brief of Canadian *Amici Curiae* at 33 (emphasis added). But the test and comparison groups were not "selected" from the universe of all U.S. sales; the test and comparison groups taken together are the universe of all U.S. sales. Canadian *amici*'s claim that Commerce has failed to address the possibility of calculating a single standard deviation for all U.S. sales is thus without merit; Commerce has addressed why it is not appropriate to calculate a single standard deviation for the commingled test and control groups and the rationale is the same.

Moreover, Canadian *amici*'s error illustrates the correctness of Commerce's approach. It clarifies that the real issue is that the standard deviation of the whole population of U.S. sales prices increases when there is a large amount of variation in such prices, and therefore it is not helpful to measure whether such variation–

whether large or small–is attributable to a pattern of significant price differences among purchasers, regions, or periods of time.  And that is the pattern that Commerce is required by the statute to consider.  At most, comparing the difference in the mean price for a particular U.S. purchaser, region, or period of time and other such purchasers, regions, or time periods to the overall amount of variability within U.S. sales prices might be useful to determine whether a particular test group was more or less of an "outlier" within the overall database of U.S. sales relative to other test groups.  But it would not be relevant to the statutory analysis Commerce is instructed to undertake here.

## II.  COMMERCE HAS ADEQUATELY EXPLAINED WHY A SIMPLE AVERAGE IS PREFERABLE TO A WEIGHTED AVERAGE WHEN CALCULATING THE COHEN'S *d* DENOMINATOR FOR PURPOSES OF THE DIFFERENTIAL PRICING ANALYSIS

This Court has found that the statistical literature cited by Commerce provides for the calculation of a combined standard deviation of test and control groups of unequal sizes by a weighted average rather than a simple average.  Mid Continent V, 31 F.4th at 1380 (Appx984).  On remand, Commerce has explained why the use of a simple average is appropriate to the particular task it is carrying out under the statutory mandate.  Appx2411-13, Appx2419-32, Appx2444-61.

Specifically, Commerce explains that the academic literature prescribing the use of a weighted-average or "pooled" standard deviation presupposes that the test

and control groups are samples taken from a larger population. This literature establishes that, in the context of a "power analysis"–that is, an assessment of whether data based on sampling has statistical significance–the size of a sample directly affects the reliability of the results when extrapolated to the full population. Appx2410 (citing Jacob Cohen, <u>Statistical Power Analysis for the Behavioral Sciences</u> (1988)). When the sample test and control groups have the same size, and therefore the same degree of reliability with respect to the full population each is drawn from, the pooled standard deviation is calculated by a simple average,[3] Appx2411, but when the samples are of unequal size, a weighted average ensures that the more reliable sample is given greater weight. <u>Id.</u> (citing Robert Coe, "It's the Effect Size, Stupid: What Effect Size Is and Why It Is Important" (2002)). Drawing on these principles, Commerce concludes that in the context of its analysis where both the test and control groups represent full populations, not samples as discussed in the literature, and therefore the calculated standard deviations of each are equally fully reliable estimates of the actual standard deviations of each full population, simple averaging is appropriate. Appx2412-13.

---

[3] This is Dr. Cohen's "equation 2.2.3."

Canadian *amici* identify four possible ways of pooling the standard deviations. Brief of Canadian *Amici Curiae* at 14-17. What they call Method 1 (the standard deviation of the full population) and Method 4 (the standard deviation of the commingled test and control groups) are single standard deviations that have already been discussed above. Method 2, or simple averaging, is acceptable under certain conditions–according to Canadian *amici*–because, "when the assumption of equal variances is violated to a minor extent (*i.e.*, the standard deviations of the two groups differ slightly), the *d* coefficient may still be calculated to contextualize the difference between means in terms of the average of the standard deviations, as long as the assumption that the groups are of equal size holds." Id. at 15 (summarizing their interpretation of Dr. Cohen's work). Canadian *amici* claim that Method 3, weight averaging, is supportable when "the standard deviations of the groups being compared differ and the groups are not of equal size, but one can assume that the groups (whether samples or subpopulations) were selected from the same population." Id. at 16 (citing Paul D. Ellis, The Essential Guide to Effect Sizes: Statistical Power, Meta-Analysis, and the Interpretation of Research Results (2010)).

Canadian *amici* do not point to any discussion in the literature that unequivocally states that their preference for any one of these methods is applicable to full populations as well as to samples. Rather, they simply assume

that there ought to be no difference as long as the test and control groups are "selected from the same population."  Id.; see also id. at 21 (denying that the "principles underlying {Methods 2 and 3} require the use of sample data), id. at 22 (noting that Cohen sometimes refers to test or control groups as "populations" without claiming that Cohen's use of this term was specifically distinguished from "samples" rather than a mere colloquialism).  But this is consistent with Commerce's reading of these methods as appropriate to samples, each of which is a more or less reliable proxy for the variance of the full population from which the test and control groups are drawn.  If one sample is larger than another and thus a more reliable proxy for the variance of the full population, it should be given greater weight; if the samples are of equal size and therefore equally reliable proxies for the full population variance, then a simple average (or, put differently, a weighted average with equal weights) is appropriate.

But, as demonstrated above, Commerce is not seeking a proxy for the standard deviation of the full population of U.S. sales prices.  Commerce has the full dataset of all of a respondent's U.S. sales prices and could calculate it directly, but the agency–correctly–has determined that this is not the appropriate way to assess what the statute directs Commerce to assess, namely the existence of a pattern of significant price differences among purchasers, regions, or periods of time.  It is true that the cited literature suggests how one might estimate the

standard deviation of the full population based on sampled data, either by simple or weighted averaging depending on the sizes of the various samples. But this does not make either averaging methodology appropriate for the specific task Commerce has before it.

Rather, Commerce has drawn from the literature the principle that the Cohen's *d* coefficient expresses something meaningful about the significance of a difference in the mean values of a test and control group when compared to the average standard deviation of the two groups, weighted by their relative reliability. When both groups are full populations and therefore equally reliable, a simple average is appropriate. This is the only method that ensures the difference between the means of each test and control group is measured equally with respect to the variation <u>within</u> each distinct group.

By contrast, Canadian *amici*'s two preferred methodologies–Method 1 (a single standard deviation of the whole dataset) and Method 3 (a weighted-average standard deviation of the two parts of the same whole dataset, justified by the academic literature as a proxy for the single standard deviation of the whole dataset when the two groups are samples)–use the <u>overall</u> variation of the dataset as the measuring stick for the significance of price differences, regardless of the variation within any particular test or control group. This is less informative as to whether

there is a <u>pattern</u> of price differences by purchaser, region, or time period, and therefore less reasonable than the approach Commerce has chosen.

### III. COMMERCE'S CALCULATION OF THE COHEN'S *d* DENOMINATOR MUST BE EVALUATED IN THE CONTEXT OF THE DIFFERENTIAL PRICING MECHANISM AS A WHOLE

The only aspect of Commerce's differential pricing methodology at issue in this appeal is the calculation of the Cohen's *d* denominator. <u>Mid Continent V</u>, 31 F.4th at 1381 (Appx985). As this Court has acknowledged, other aspects of the methodology have been in dispute in other cases before the Court, <u>id.</u> (citing <u>Stupp Corp. v. United States</u>, 5 F.4th 1341 (Fed. Cir. 2021)) (Appx985), and Canadian *amici* assert that all of these questions are interrelated. Brief of Canadian *Amici Curiae* at 27-30. Because the parties to this appeal do not address these other issues, and Canadian *amici* do so only in a cursory fashion, *Amicus* does not address them directly here. Nevertheless, Canadian *amici* are correct to observe that the reasonableness of Commerce's calculation of the Cohen's *d* denominator should be assessed in the context of the differential pricing methodology as a whole and the statutory question it is designed to answer.

In particular, the question of how to calculate the Cohen's *d* denominator arises only when the standard deviations–that is, the distributions–of particular test and control groups are not the same. After all, if the test and control groups have the same standard deviation, all methodologies for combining them will produce

the same result.  The entire issue in this litigation, therefore, is the reasonableness

of how Commerce treats test groups–U.S. sales for prices for particular purchasers,

regions, or time periods–in which the <u>distribution</u> of sales prices for that particular

purchaser, region, or time period, as well as the mean price, <u>differs</u> from the prices

for all other purchasers, regions, or time periods.  Unusual distributions of prices to

a given purchaser, region, or time period, as well as unusual average prices, are

evidence of a <u>pattern</u> of price differences–precisely the question Commerce is

charged with examining.

In assessing whether "there is a pattern of {U.S. sales prices} for comparable

merchandise that differ significantly among purchasers, regions, or periods of

time," 19 U.S.C. § 1677f-1(d)(1)(B)(i), any reasonable methodology would take

into account <u>both</u> whether the <u>average</u> price for a given purchaser, region, or period

of time during the period of investigation or review differs from that for other

purchasers, regions, or periods of time, <u>and</u> whether the <u>distribution</u> of prices over

the period of investigation or review for that purchaser, region, or period of time is

different from that for other purchasers, regions, or periods of time.

The Cohen's *d* coefficient with simple averaging in the denominator allows

Commerce to assess both of these important aspects of pricing patterns.  The

alternative denominator calculations that Canadian *amici* advance all tend to

smooth out unusual price differences <u>within</u> test groups (or control groups) in favor

of a single overall or weighted-average overall variance. It is true that when the Cohen's *d* coefficient is being calculated in the context of research on sample groups, a power analysis might want to smooth out unusual differences within a group that might otherwise distort the explanatory power of the sample results. Much of the academic literature cited by this Court in other cases reflects precisely this issue. See, e.g., Stupp, 5 F.4th at 1358-59 (citing James Algina et al., An Alternative to Cohen's Standardized Mean Difference Effect Size: A Robust Parameter and Confidence Interval in the Two Independent Groups Case, 10 Psychological Methods 317, 318 (2005)); Johnson Ching-Hong Li, Effect Size Measures in a Two-Independent-Samples Case with Nonnormal and Nonhomogenous Data, 48 Behavioral Research 1560 (2015); Robert J. Grissom & John J. Kim, Effect Sizes for Research: Univariate and Multivariate (2d ed. 2012)). In those other cases, including in the softwood lumber proceedings with which *Amicus* is most familiar, Commerce has addressed these questions and studies directly in subsequent administrative reviews and remand determinations. See, e.g., Brief of Canadian *Amici Curiae* at 4 n.8. Because they are not at issue in this particular appeal, they need not detain us here.

However, Commerce is not conducting a power analysis to determine the robustness of statistical inferences that can be drawn from samples of pricing data. Commerce is examining the totality of U.S. sales of a respondent in order to

determine whether they exhibit a pattern of significant price differences along three specific axes. And in this specific context, that a methodology highlights unusual distributions of pricing within test groups is an advantage, not a hindrance.[4] In the context of the full differential pricing methodology and the specific statutory test Commerce is trying to apply, Commerce's adaption of the Cohen's *d* statistic, including the use of simple averaging in the denominator, is fully reasonable and should be affirmed by this Court.

## CONCLUSION

For the reasons given above, the alternative methodologies for calculating the Cohen's *d* denominator proposed by Canadian *amici* would make Commerce's differential pricing methodology less reasonable, not more. The arguments of Canadian *amici* therefore do not detract from the reasonableness of Commerce's

---

[4] Similarly, to the extent that the Cohen's *d* analysis might produce unreliable results in the case of very small test groups or unusually stable pricing to a particular customer, region, or time period, as the <u>Stupp</u> court wondered, 5 F.4th at 1359, the ratio test (which weights large test groups much more heavily than small test groups) and the meaningful difference test (which would tend not to find a meaningful difference between an average-to-average and an average-to-transaction methodology when all transaction prices are very close to the average) would render harmless any error in the application of the Cohen's *d* test to such test groups.

remand determination in this case, which should therefore be affirmed by this Court.

Respectfully submitted,

/s/  David. A. Yocis

David A. Yocis
Whitney M. Rolig

**PICARD KENTZ & ROWE LLP**
1155 Connecticut Ave., NW,
Suite 700
Washington, DC 20036
(202) 331-5040

August 22, 2024                    *Counsel to the COALITION*

# CERTIFICATE OF COMPLIANCE

## CAFC Court No. 2024-1556
## <u>Mid Continent Steel & Wire, Inc. v. United States</u>

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it contains 3,974 words, which does not exceed the maximum authorized by Federal Circuit Rule 29(b).

Date: August 22, 2024        Signature:    *<u>/s/ Whitney M. Rolig</u>*

                                     Name:        <u>Whitney M. Rolig</u>

**PUBLIC CERTIFICATE OF SERVICE**

**MID CONTINENT STEEL & WIRE, INC. v. UNITED STATES, 2024-1556**

I hereby certify under penalty of perjury that on this 22nd day of August, 2024, a copy of the foregoing BRIEF OF COMMITTEE OVERSEEING ACTION FOR LUMBER INTERNATIONAL TRADE INVESTIGATIONS OR NEGOTIATIONS AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANT-APPELLEE was filed electronically.

_X__ This filing was served electronically to all parties by operation of the Court's electronic filing system.

_____ A copy of this filing was served via:

    _____ hand delivery

    _____ mail

    _____ third-party commercial carrier for delivery within 3 days

    _____ electronic means, with written consent of the party being served to the following addresses:

                /s/  David A. Yocis

                David A. Yocis

                **PICARD KENTZ & ROWE LLP**
                *Counsel to the COALITION*